### THE STATE v. HENRY LE BLANCH.

*The possession, in this state, by the thief, of property stolen in another state, does not constitute the crime of larceny in New Jersey.*

This was a case reserved by the Court of Oyer and Terminer of the county of Middlesex. The facts were these: The defendant stole a horse, wagon, and harness, in the county of Philadelphia, state of Pennsylvania, and brought them into the county of Middlesex, in this state. Having been indicted and found guilty in the latter county, the sentence was suspended to obtain the opinion of this court as to the legality of such conviction.

For the state, *J. C. Elmendorf.*

For the defendant, *J. Elmer Stout.*

The opinion of the court was delivered by

THE CHIEF JUSTICE. This case presents for consideration the question, whether the possession, by the thief, in this state, of property stolen by him in a foreign jurisdiction, constitutes the crime of larceny?

According to a very ancient rule of the common law, if a man stole goods in one county and carried them into another, he might be indicted and tried in either. In such cases, it is obvious, no important rights are involved.

Whether the crime shall be regarded in a legal point of view as having been committed in the county of A, or in the county of B, or in both, can make little difference, either to the culprit on the one hand or to the public on the other. In any view the same law has been infringed, the same punishment will be inflicted, and the result of the proceedings will be everywhere conclusive. Under such circumstances, therefore, the rule to be adopted does not rise above the level of a mere question of expediency. In practice it was

often found to be convenient to try the offender in the county in which he was apprehended, and as the law of *venue* required the crime to be tried by a jury of the vicinage, in order to preserve the harmony of the system, the subtility, almost amounting to a fiction, was introduced, that in case of a larceny the possession of the owner, in contemplation of law, continued, and that, consequently, there was a felonious taking in each county into which the thief passed with the stolen property. This refinement, proceeding from the year books and sustained by numerous adjudications, has always been the settled law of this state.

But when, as in the case now before the court, the proposition is to extend this theory from counties to independent states, the question expands into importance. The rights of the party inculpated then become involved, and we must be conducted to a conclusion by far different considerations than those which might seem sufficient to establish a mere matter of convenient practice. This being the first occasion on which this subject has been submitted to the consideration of this court, and as the practice in the counties is understood to be discordant, it seems proper that the question should be settled in accordance with the weight of authority and the general principles of our jurisprudence.

An examination of the ancient authorities would appear to establish, in a very satisfactory manner, that the grounds of the common law, on which the triableness of larceny in any one of several counties was vested, are not applicable as between independent sovereignties. It will be found that the distinction between the enforcement of the laws of the realm, and any attempt to take jurisdiction over offences extra territorial, was, at a very distant period, the subject of investigation. In Butler's case, referred to in 13 *Rep.* 53, this point was discussed. It was a case of robbery on the seas—the goods being brought into the county of Norfolk, where the robber was apprehended with them in his possession. These are Lord Coke's words: " I was of opinion that in that case it could not be felony punishable by the common law, because

that the original act (*scil't*) the taking of them (the goods) was not any offence whereof the common law taketh knowedge, and by consequence the bringing of them into a county could not make the same felony punishable by our law; and it is not like where one stealeth goods in one county and brings them into another ; there he may be indicted of felony in any of the counties, because that the *original act was felony whereof the common law taketh knowledge.*"

This case is again referred to by Lord Coke in 3 *Inst.* 113, where he reports it as a decision of the court in the twenty-eighth year of the reign of Elizabeth, and he again, with emphasis, gives the reasons of the judges, who held that the indictment would not lie, " because," he says, " the original taking was no felony, whereof the common law took conusance, because it was done upon the sea, out of the reach of the common law ; and therefore not like the case where one stealeth in one county and carrieth the goods into another, for there the original *act was a felony whereof the law took conusance.*"

These extracts contain and at the same time elucidate the whole doctrine. It is the first taking which characterizes the second taking, inferred by law from the fact of possession in a second or other county. But it was indispensable that the original offence should have been committed under such circumstances as to give the common law cognizance of it.

This same doctrine is stated with equal directness by Mr. East, in his *Treatise on the Pleas of the Crown, Vol.* 2, *p.* 772. After stating the general rule that " if one steal goods in the county of A, and carry them into the county of B, he may be indicted or appealed of larceny in the latter county," he adds, · " to this, however, there are some exceptions, as where the *original taking* is such whereof the common law cannot take notice, as of goods obtained by theft, or robbery at sea, and afterwards carried into some county ; in which case, the common law gives no jurisdiction to inquire of the felony." So in the case of *Rex* v. *Anderson,* which was de-

cided in 1763, where the original taking was in Scotland, it was ruled by all the judges that the felon could not be indicted in Cumberland, in which county he was taken with the goods.

At the time of this decision, Scotland, though a part of the British dominions, was a distinct kingdom, so far as concerned her criminal laws.

Again, in the modern case of *Regina* v. *Prowes, Ry. & M.* 349, the same doctrine was reiterated, the court holding that where it appeared that the prisoner stole the goods in the island of Jersey, and they were found in his possession in Dorsetshire, the offence was not indictable in the latter county. And so firmly rooted was the law upon this subject, that it has required several statutes to remedy the inconvenience thus arising from the want of unity in the system of criminal law which prevailed in different parts of the kingdom of Great Britain. See 2 *East P. C.* 772; *Arch. C. P. & P.* 242.

From this review it would seem to be clear that the common law doctrine, arising from the transfer of stolen property from one county to another, affords no countenance to the idea that a larceny committed under one system of criminal law can be punishable under another and different system. The principle adopted was simply this, that a taking would be implied from the possession of the chattels in those cases in which the first caption of them was an infringement of the common law; thus the measure of the crime, the mode of trial, the extent of punishment, and the effect of the conviction would be identical in whichever county the trial occurred. All beyond this was a mere question of *venue*—a matter so pliant that it would expand under the slight pressure of convenience.

In the English courts, then, the common law doctrine above stated has been neither misunderstood nor misapplied, but has been restrained severely within the limits of legal principles. But in this country there has been considerable clashing of judicial opinion on this subject, and the practice in the several states has not been consistent. In Pennsylvania, Kentucky, Tennessee, and North Carolina, the English rule

has been followed, and the same view of the law was adopted by the courts of New York until the practice in that state was altered by statute. *Simmons* v. *Commonwealth*, 5 *Binn.* 617; *People* v. *Schenck*, 2 *Johns.* 479; *People* v. *Gardner*, 2 *Id.* 477; 1 *Hawk.* 100; 1 *Arch. C. L.* 281, note 1; *Wharton's Crim. L.*, § 1816, 1817.

But the opposite rule has obtained in Maryland, Ohio, Massachusetts, Connecticut, Vermont, and Maine. *Cummings* v. *State*, 1 *Harr. & Johns.* 340; *Hamilton* v. *State*, 11 *Ohio* 435; *The State* v. *Mockridge*, cited in 11 *Vt.* 654; *State* v. *Ellis*, 3 *Conn.* 185.

But it is to be remarked that in each of the states last named the rule has been put explicitly not upon any general reasons, but upon the existence of a local practice which had grown up, *sub silentio*. In the case of *The State* v. *Ellis*, above cited from 3 *Conn.*, the court declined all theoretical discussion of the point and contented themselves with reposing on local precedent, saying that it "is much too late to recur to first principles." So in *The State* v. *Bartlett*, 11 *Maine* 653, Redfield, Justice, in delivering the opinion of the court, expressly declares that were the question *res integra* and to be decided on the weight of authority, he would incline to the English view of the law.

In the recent case in Massachusetts of *Commonwealth* v. *Uprichard*, 3 *Gray* 434, the question was presented whether, when the original taking was in one of the British provinces, the transportation of the stolen property into Massachusetts constituted larceny. The courts of that state had repeatedly held that, as between the states, such possession would be larceny, and as the states, with regard to all laws regulating their internal police, are as much foreign *inter sese* as each state is to foreign governments, it would have seemed to be a necessary sequence, if consistency was to be preserved, for the court to hold that the offence was indictable within their jurisdiction. But the opposite result was attained—the court maintaining that the offence in question was not punishable within the commonwealth of Massachusetts.

State v. Le Blanch.

And it is remarkable that every reason, without exception, and many of them are most cogent ones, which are urged with so much force in the able opinion of Chief Justice Shaw against the jurisdiction in that case, apply in all their fullness, to the implication of a larceny from the possession of stolen goods in one state after their theft in another. And indeed the opinion, I think, virtually admits that had the subject been a new one to the court, the same rule which was adopted with respect to a felony committed in the British territory, would have been applied to the same offence perpetrated in one of the American states.

The result of the authorities seems to be this; that the principle that a larceny can be inferred from the possession of the goods in a foreign jurisdiction is opposed to the English law, and likewise to all the decisions in this country which assume to be founded in legal science; and that all that it has in its support is a local usage in some of the states.

But the doctrine in question is not only inconsistent with authority, but is incompatible, in my opinion, with the general principles of law and natural justice. It is universally conceded, that criminal laws are in their nature local, and in their operation are confined within the limits of the state in which they are enacted. But when larceny is inferred from the possession of the stolen property in a jurisdiction other than that in which the original felonious taking occurred, it is impossible to overlook the fact, that it is the foreign and not the domestic law which is enforced. For illustration, let us suppose goods taken under such circumstances as to give rise to the question whether the act is a larceny or a mere breach of trust—which law is to be regarded in settling the question? I think all will admit that it is the foreign law which must determine the criminality or the innocence of the act, for it will scarcely be pretended, that if the original acquisition of the property was not criminal, it can be made so by the transportation of such property into a new jurisdiction. In all cases, then, of this nature, the judge trying

the cause must decide whether, by force of the facts proved, the offence was larceny in the place of the original transaction; and if the proposition is solved in the affirmative, the prisoner would be convicted, but if in the negative, the result would be an acquittal. It is obvious that this is not the execution of the domestic law, but the enforcement of the penal code of a foreign government.

It seems to me, too, that a dangerous circumstance attendant on the practice in question would be its tendency to effect a trial of offenders at a distance from the place where the crime is alleged to have been committed. There was much wisdom in the rule of the common law which, for the purposes of trial, gave a locality to crimes. As a general rule, they cannot be favorably investigated, either on the part of the state or in behalf of the prisoner, except at a place reasonably near to the locality where the imputed offence was perpetrated. It is there that the character of the parties can be ascertained and proved; there the witnesses ordinarily reside, and there all the circumstances, often minute but generally important, can be gathered up to explain or to lend a point to the more direct evidence. This is a principle that from time immemorial has been considered the right of the prisoner in the administration of criminal law. So highly prized has it been, it has freqently been made the subject of constitutional guaranty. Thus the Massachusetts Bill of Rights declares "that in criminal prosecutions, the verification of the facts in the vicinity where they happen is one of the greatest securities of the life, liberty, and property of a citizen." A similar provision exists in the constitution of Tennessee and among the amendments to the constitution of the United States. I am utterly unable to perceive why the right should be abolished, with regard to the class of cases under consideration.

But a still more substantial objection to the practice is, that it renders the trial inconclusive. A larceny is committed when with the requisite felonious intent there has been a taking and asportation; the conveyance of the property over a

territorial line cannot duplicate the criminality. In the eye of reason and in the nature of things it is but a single offence, both before and after such transportation. The consequence is that the criminal, as a matter of ordinary justice, should be but once tried for the offence. I know it has been intimated, even judicially, that we need have no such tenderness for thieves as to endeavor to prevent their being punished in two or more states for the same theft. Why not then abolish the plea of *autrefois convict* and punish them twice in the same jurisdiction? I cannot agree to the suggestion. The law is humane even to criminals. But without pity for the guilty are we to be without justice for the innocent? The doctrine necessarily goes to this length, that after a trial, attended with all legal formalities and an aquittal by solemn judgment of law, the party so acquitted is left liable to a second trial, in another jurisdiction, for substantially the same offence. This is a result which violates both natural equity and that fundamental rule of American law, which forbids that a citizen shall be twice jeopardized for the same offence. I think it unwise to throw down even the least of the safeguards which the law, in its wisdom, has devised for the protection of the innocent. The right of personal security, in my view, is more important than even the punishment of crime.

Nor does there seem to be even the excuse of necessity for this departure from correct principle. The practice of the states, under the constitutional provision, affords a proper remedy in cases of stolen property brought within our territory, in the surrender of the criminal to the authorities of the state whose laws have been violated. It does not seem to me, that either the claims of comity or the necessities of self-defence require us, at our own expense, to punish the infraction of foreign laws. Our duty is discharged when we arrest the offender and hold him subject to the requisition of the government whose civil order has been broken.

In the opinion of the court the conviction in the present

case cannot be sustained and the prisoner should be discharged, but not until notice has been given to the authorities of Pennsylvania, in order that a requisition may be obtained, if they shall deem such course proper.