# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

### DECEMBER SESSION, 1997

FILED

September 10, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 03C01-9703-CR-00117 |
| | ) | |
| Appellee, | ) | SULLIVAN COUNTY |
| | ) | |
| vs. | ) | |
| | ) | HON. R. JERRY BECK, JUDGE |
| LON MITCHELL PIERCE, JR., | ) | |
| | ) | (FELONY MURDER; THEFT OVER |
| Appellant. | ) | $10,000; MISDEMEANOR THEFT; |
| | ) | EVADING ARREST) |

FOR THE APPELLANT:

**JAMES S. ROACH**
Attorney at Law
128 E. Market Street
Johnson City, TN 37604


**DONALD E. SPURRELL**
Attorney at Law
128 E. Market Street
Johnson City, TN 37604

FOR THE APPELLEE:

**JOHN KNOX WALKUP**
Attorney General and Reporter

**MARVIN E. CLEMENTS, JR.**
Assistant Attorney General      and
2nd Floor, Cordell Hull Building
425 Fifth Avenue North
Nashville, TN 37243


**H. GREELEY WELLS**
District Attorney General

**TERESA M. SMITH**
Assistant District Attorney General
P.O. Box 526
Blountville, TN 37617

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# OPINION

The Appellant, Lon Mitchell Pierce, Jr., was found guilty by a Sullivan County jury of the crimes of first degree felony murder, theft over $10,000, misdemeanor theft, and evading arrest. At the time of the instant offenses, the Appellant was fifteen years of age. Following a hearing in the Juvenile Court, the Appellant was transferred to the Criminal Court for trial as an adult. Although the Appellant was also indicted on a charge of simple possession of cocaine, the jury returned a verdict of not guilty as to this count. In accordance with the sentencing provisions for the capital crime of felony murder, the trial court fixed the Appellant's sentence at life imprisonment. Following a sentencing hearing for the remaining convictions, the trial court imposed an effective sentence of four years and ordered that this sentence run concurrently to the life sentence. In this appeal as of right, the Appellant raises the following issues:

    I.    Whether the State of Tennessee had jurisdiction over the offenses of felony murder and felony theft;

    II.    Whether the evidence is sufficient to sustain the Appellant's conviction for felony murder;

    III.    Whether the trial court properly denied the Appellant's request for special instructions regarding the felony murder charge;

    IV.    Whether the court properly charged the jury regarding lesser offenses of felony murder; and

    V.    Whether the trial court erred in allowing the jury to sentence the Appellant to life in prison.

After a review of the record, we affirm the judgment of the trial court.

2

Background


Although the events which resulted in the Appellant's conviction for felony murder occurred on November 22, 1995, in Sullivan County, Tennessee, the events which ultimately lead to this tragedy began in Orlando, Florida on November 2, 1995. On this date in Orlando, Nora Comacho and her husband stopped at a convenience store for gasoline. Passengers in the Comacho's blue 1995 Dodge Caravan included their fourteen year old daughter, Sarah, the Appellant, age fifteen, his sixteen year old girlfriend, April Worley, and a four year old child in Worley's care. Mrs. Comacho entered the convenience store to purchase a soft drink for her daughter. Upon Mrs. Comacho's return to the minivan, an argument ensued between herself and her daughter, Sarah, because the soft drink was in a cup and not in a bottle. Mr. Comacho got out of the minivan and went to purchase a bottled soft drink for his daughter. Meanwhile, Mrs. Comacho began to pump gasoline into the minivan's gas tank. Sarah "slipped over in the driver's seat, hit the automatic [door] locks, turned the ignition on and drove off with the gas hose in the van." An employee of the convenience store immediately notified the Orlando Police Department. Nora Comacho advised law enforcement authorities that her daughter had taken her vehicle on two prior occasions, only to be returned without legal repercussions. However, regarding the present offense, she advised authorities that she wanted to press charges. The Dodge Caravan was subsequently entered into the NCIC computer to provide a nationwide bulletin of the stolen vehicle.


After fleeing the convenience store, Sarah Comacho commandeered the minivan for approximately twenty minutes before asking the Appellant to drive due to her inexperience. The Appellant took control of the vehicle and returned the

3

four year old child to his home.  April Worley suggested that the trio travel to Bristol, Virginia, in order to visit her grandmother.  With the Appellant and Worley driving in alternating shifts, the trio reached Virginia in about twelve hours.  For the next several weeks, the teenagers stayed with Worley's grandmother at her residence in the Rice Terrace Apartments and in local motels.  The three spent their time "mostly [riding] around . . . to different cities [in Tennessee]."  During this period, the group was involved in several incidents of shoplifting, and on one occasion, "Sarah [Comacho] got caught shoplifting a Notre Dame jacket from K-Mart in Kingsport."  Although they were able to escape, the group feared that the store personnel had obtained the license plate number of the minivan.  This concern prompted the trio to steal a "license plate from the same color and type van [they] were driving."  They located Laura Alice Rippetoe Bassett's light blue Dodge Caravan, bearing Sullivan County tag number 396-NXX, near the Target store in Johnson City.  After stealing the plate, they " threw the old plate in the dumpster at a mini-market."

Twenty days after the theft of the van from Nora Comacho in Florida, police officers in Bristol, Virginia, received information concerning a possible stolen blue Dodge minivan located in the Rice Terrace area.  At approximately 3:15 p.m. on November 22, 1995, Officers Matthew Quillen and Vic Jordan located a vehicle matching this description parked on Buckner Street near the Rice Terrace Apartments.  Although the van appeared unoccupied and the officers never observed anyone enter the van, the van pulled out of the parking lot about ten minutes later. The officers noticed that a male, later identified as the Appellant, was driving the van and that a female, later identified as April Worley, occupied the front passenger seat.  Quillen and Jordan began following the minivan.  As the van approached an intersection, it failed to stop before turning right.  At this point the

4

officers turned on the patrol car's blue lights to initiate a vehicle stop. The van failed to respond, accelerated, and proceeded to pass a school bus that was unloading children. At this point, the officers activated the emergency sirens. After a three minute pursuit through Bristol, Virginia, during which the Appellant continued to violate numerous traffic laws, the minivan crossed into the state of Tennessee. Bristol, Tennessee police were notified of the pursuit and Quillen and Jordan returned to Virginia.

Bristol, Tennessee Police Officer James Breuer continued the pursuit of the minivan. Like his Virginia counterpart, Breuer activated all emergency equipment on his patrol car, however, the Appellant refused to stop. Breuer described his pursuit as a low speed chase, approximately forty-five miles per hour in a twenty-five mile per hour speed zone, during which time the Appellant continued to violate traffic laws. Breuer stated that the minivan "would slow down almost to a stop to allow vehicles in front of him to pull over." At one point during the pursuit, the van "tapped" the back of a civilian vehicle at an intersection, which caused Breuer's patrol car to hit the back end of the van. No damage resulted to either vehicle.

Lieutenant Danny Baines joined Breuer's fourteen and one-half mile pursuit as the chase proceeded away from the Bristol city limits. Once leaving the city limits, Captain Daryll Chambers of the Sullivan County Sheriff's Department took the lead. Although the Bristol police officers continued as backup in the pursuit, the officers deactivated their emergency equipment. Both Bristol police officers and Sullivan County deputies were notified that the possible stolen vehicle may contain both narcotics and weapons. The chase continued throughout the county on Route

5

44, with speeds varying between twenty-five miles per hour to sixty-five miles per hour.

Deputy Steve Mullins radioed to Chambers that "he was. . .coming down old 421 and he advised he would come down Hickory Tree Road and try to cut them off." Shortly thereafter, Chambers was able to spot the blue lights of Mullins' patrol car, approximately four-tenths of a mile in the distance. It appeared that Mullins had "a road block set up" with his vehicle. Although Mullins' patrol car extended approximately two feet over the center line, enough room remained in which a vehicle could safely maneuver around the deputy's car. Proof was introduced at trial based upon a reconstruction of the collision. The reconstruction revealed that oncoming traffic could safely maneuver around the positioned patrol car. In fact, a Ford pickup truck pulling a dual axle cattle trailer was able to pass. The reenactment also revealed that a vehicle traveling approximately 55 to 60 miles per hour could safely maneuver past the parked patrol car and turn onto Green Road immediately past the road block. Additional testimony indicated that the Appellant could have turned on to a side road prior to reaching the roadblock. Deputy Mullins positioned himself behind the patrol car, and raised his weapon at the oncoming van. Chambers testified that, as the minivan approached the roadblock:

> . . .the van slowed some. It was in my mind at that time that it was going to stop. But, he slowed down to a constant speed and then he didn't, he didn't slow down any more and I was still right behind him. He proceeded on towards where the cruiser was at in the highway. He didn't try to avoid collision with the cruiser. He didn't try to go to the right. He didn't, he drove straight into the front of that cruiser. . . . Upon impact, the van veered off to the right. [Deputy] Mullins, it just sent him flying through the air, like a rag doll really, just, he went back and they [sic] was a tire truck . . . parked some distance from the cruiser behind the cruiser. And, it knocked him back, it looked like he hit the front of the truck and then veered off to the right, landed in the middle of the highway. . . . I jumped out of my cruiser and I run to Steve and hollered at him and shook him, and he was bleeding real,

6

real bad he was bleeding. . . . And, then he quit bleeding, he wasn't bleeding any more and I checked his pulse, he didn't have a pulse, he wasn't breathing. . . .

Deputy Mullins, a nineteen year veteran of the Sheriff's Department, died on the scene as a result of massive head injuries sustained during the incident. The Bristol police officers already on the scene arrested the Appellant, April Worley, and Sarah Comacho. No weapons were found in the vehicle, although officers did discover one-tenth of one gram of cocaine, which the teens stated belonged to Worley's aunt.

In a subsequent statement to law enforcement officers, the Appellant explained that "[t]he reason I didn't stop [during the pursuit by law enforcement officials] was because I was scared . . . all I wanted to do was get on the interstate and get out of the van and leave it there and get away from it. . . ." Furthermore, he recounted his version of the collision resulting in Deputy Mullins' death:

> I saw the police car pull out across the road in front of me. He was across his lane and in my lane just a little bit, but I had enough room to go around him in my lane. I was trying to go around him and that's what I wanted to do.
>
> I saw the police officer open his car door and he pointed a . . . pistol at the van. . . .
>
> When I saw the pistol, I thought I put my foot on the brake, I'm not sure if I did or not. I let go of the steering wheel and ducked straight down with my arms covering my face. I then heard and felt the crash and knew I'd hit something. I thought I was swerving to the right and would miss the police officer when I ducked my head.

Based upon the evidence presented at trial, the jury found the Appellant guilty of felony murder, felony theft of the minivan, misdemeanor theft of a license plate, and evading arrest.

7

## I. Jurisdiction

In his first issue, the Appellant challenges his conviction for felony theft of the minivan which established the predicate offense for his first degree murder conviction. The Appellant, citing only an Illinois case as authority, argues that the State of Tennessee lacked jurisdiction to prosecute the Appellant for a felony committed in Florida and a killing committed in Tennessee. *A fortiori*, if there was no theft, there could be no felony murder conviction. He offers no argument or explanation in support of his conclusory statement. As such, he has effectively waived review of this issue. Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Notwithstanding waiver, we elect to proceed upon the merits of the Appellant's contention.

Any person is liable to punishment under the laws of this state for an offense committed either wholly or partly within this state. See Tenn. Code Ann. § 39-11-103(a). Rule 18 of the Tennessee Rules of Criminal Procedure provides, in part:

> (a) . . . offenses shall be prosecuted in the county where the offense was committed.

> (d) Offenses committed wholly or in part outside this state, under circumstances that give this state jurisdiction to prosecute the offender, may be prosecuted in any county in which an element of the offense occurs, or in the case of an offense committed wholly outside this state in any county in which the offender is found.

There is no dispute that Deputy Mullins was killed in Sullivan County, Tennessee. Thus, the State has jurisdiction over this homicide. However, the penal laws of a particular sovereignty usually have no extraterritorial effect and, since one sovereignty cannot enforce the penal laws of another or punish offenses committed

8

in and against another sovereignty, it is a general rule of criminal law that the courts of a particular sovereignty have no jurisdiction of offenses committed outside their sovereign's territorial jurisdiction. 22 C.J.S. *Criminal Law* § 161(a) (1989). See also Coffee v. Peterbilt of Nashville, Inc., 795 S.W.2d 656, 659 (Tenn. 1990); 21 AM. JUR. 2D *Criminal Law* § 344 (1981); P.H. Vartanian, Annotation, *Larceny in Other State or Country*, 156 A.L.R. 862, 863 (1945). Thus, although a criminal may be found within its territorial borders, a state will not attempt to punish a person for the commission in another state of a crime which is consummated and which is not of such continuing nature as to constitute an infringement of the laws of the forum after the alleged criminal has entered its territorial jurisdiction. See P.H. Vartanian, Annotation, *Larceny in Other State or County,* A.L.R. at 863. The Appellant contends that, since the felony theft of the Comacho van occurred in the State of Florida, the State of Tennessee lacks jurisdiction over the offense. Again, if there is no theft, there can be no felony murder. Accordingly, we are confronted with the following question: Is a person criminally liable for theft under our current criminal code if that person steals property outside this state and brings the stolen property into Tennessee? We answer in the affirmative.

According to an ancient rule of common law, if a man stole goods in one county and carried them into another, he might be indicted and tried in either; because, for convenience sake, it was easier to try the offender in the county in which he was apprehended, although the law of venue required that the crime be tried by a jury of the vicinage. See P.H. Vartanian, Annotation, *Larceny in Other State or Country*, 156 A.L.R. at 864, footnote 3 (citing State v. Le Blanch, 31 N.J.L. 82 (1864)). Thus, a legal fiction was created, that is,

9

> the continued possession of stolen property, *animo furandi*, is, at every step, a new caption and that therefore the stealing of property in one county of the State and taking it into another was larceny in the latter county. Every moment's possession by the thief is a continuance of the trespass, and amounts, in legal contemplation, to a new caption and asportation.

State v. Matthews, 87 Tenn. 689, 691-92, 11 S.W. 793, 793-94 (1889) (citations omitted). See also 21 AM. JUR. 2d *Criminal Law* § 353; P.H. Vartanian, Annotation, *Larceny in Other State or Country*, 156 A.L.R. at 866.

The State of Tennessee, which had at one time rejected this theory, see Simpson v. State, 23 Tenn. (4 Hum.) 455 (1844), legitimatized this fiction of the common law through the enactment of statutes providing in substance that "[w]here property is stolen in another State and brought into this State, the jurisdiction is in any county into which the property is brought," Matthews, 87 Tenn. at 690, 11 S.W. at 793 (quoting Tenn. Code § 4977 (1857)); see also Henry v. State, 47 Tenn. (7 Cold.) 331, 333 (1870), and by making it an offense in this state to "bring into this state personal property stolen in another state, knowing the same to have been stolen." See Tenn. Code § 4697 (1857); see also Tenn. Code Ann. § 39-3-1115 (*repealed* 1989). This crime is authorized, not for the crime committed in the other state, but for the larceny committed within this state by the act of bringing stolen property into the jurisdiction. See 50 AM. JUR. 2d *Larceny* § 126 (1995).

Argument may be made that, with the enactment of the 1989 Criminal Code, based largely on the Model Penal Code, Tennessee abolished the offense of bringing stolen property into this state. We hold to the contrary. With the passage of Tennessee Code Annotated section 39-14-101 *et seq.*, the legislature eliminated the traditional distinctions between various unlawful takings in favor of one general

10

theft statute. <u>State v. Byrd</u>, No. 03S01-9705-CR-00057, slip op. at 4, Sevier County (Tenn., Knoxville (heard at Kingsport), April 27, 1998). The reason for the change was to replace "antiquated and confusing statutes with a modern easily understood language." Sentencing Commission Comments, Tenn. Code Ann. § 39-14-101. Although the new chapter eliminated the antiquated terminology of the old, it continues to prohibit the criminal conduct contemplated by the former theft statutes, see <u>Byrd</u>, No. 03S01-9705-CR-00057, slip op. at 4, thereby, clearly encompassing the offense of bringing stolen property into the state. <u>See</u> Tenn. Code Ann. § 39-3-1115. Tennessee Code Annotated section 39-14-101 provides:

> Conduct denominated as theft in this part constitutes a single offense embracing the separate offenses heretofore known as: embezzlement, false pretense, fraudulent conversion, larceny, receiving/concealing stolen property, and <u>other</u> similar offenses.

(emphasis added).

In construing that "bringing stolen property into this state" is included as an "other similar offense" within the general theft provision of the current code, we rely upon references to judicial decisions and common law interpretations to effect the objectives of the code. <u>See</u> Tenn. Code Ann. § 39-11-104.

While the general theft statute prohibits the same conduct as the former, the State is no longer required to prove the elements of the former in order to gain conviction under the current statute. By its terms, Tennessee Code Annotated section 39-14-103 provides that "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." In the present case, it is undisputed that the Appellant exercised control over Nora

11

Comacho's 1995 Dodge Caravan, without Ms. Comacho's consent, while in Sullivan County, Tennessee. See Tenn. Code Ann. § 39-11-103; Tenn. R. Crim. P. 18. This issue is without merit.

## II. Sufficiency of the Evidence

Next, the Appellant argues that the evidence is insufficient to support his conviction for felony murder committed during the perpetration of a theft. The Appellant does not contest the sufficiency of the evidence resulting in his convictions for felony theft, misdemeanor theft, and evading arrest. Relying extensively upon a prior opinion by a panel of this court, State v. Gilliam, C.C.A. No. 03-C-01-9109-CR-00287, Hamilton County (Tenn. Crim. App., Knoxville, Apr. 20, 1992), perm. to appeal denied, (Tenn. Sept. 21, 1992), he limits his sufficiency issue to whether the homicide was merely incidental, and not in perpetration of, the underlying offense. Additionally, he challenges the constitutionality of the felony murder statute. Our supreme court has, on previous occasions, addressed this issue and determined that the felony murder statute is "a legitimate and constitutional legislative function." State v. Walker, 893 S.W.2d 429, 430 (Tenn. 1995) (emphasis added). The Appellant questions the trial court's interpretation of the language "any . . . theft" to include misdemeanor thefts. A panel of this court has recently addressed this very argument and, relying upon Walker, concluded that it was the legislature's intent to encompass all theft offenses, regardless of monetary value of the property stolen, within the felony murder statute. See State v. Harris, C.C.A. No. 02C01-9603-CR-00095 (Tenn. Crim. App., Jackson, Dec. 3, 1997); Walker, 893 S.W.2d at 430 (citing State v. Hopper, 695 S.W.2d 530, 535 (Tenn. Crim. App. 1985)); see also

12

State v. Randolph, 676 S.W.2d 943, 946 (Tenn. 1984). Thus, we reject the Appellant's constitutional challenge to Tennessee's felony murder statute.

When there is a challenge to the verdict based upon the sufficiency of the evidence, this court must review the evidence in the light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); Tenn. R. App. P. 13(e). We do not reweigh or reevaluate the evidence; these are issues resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Furthermore, a guilty verdict accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Guilt may be predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Carey, 914 S.W.2d 93, 95 (Tenn. Crim. App. 1995).

In order to determine the issue of sufficiency of the evidence in this case, the controlling statutes must be analyzed. Appellant was convicted of first degree murder in the perpetration of a theft. Tennessee Code Annotated section 39-13-202 embodies what is commonly referred to as "felony murder" and defines it in part as "[a] killing of another committed in the perpetration of or attempt to perpetrate **any . . . theft**." Tenn. Code Ann. § 39-13-202(a)(2) (emphasis added). A person is guilty of the crime of theft if "with intent to deprive the owner of property, the person knowingly obtains **or exercises control over the property** without the owner's effective consent." Tenn. Code Ann. § 39-14-103 (emphasis added). Prior

to the 1989 revision of the criminal code, the only type of theft included in the felony murder statute was larceny. See Tenn. Code Ann. § 39-2-202 (Supp. 1982) (repealed 1989).

It is well-established that the fundamental role of this Court in construing statutes is to ascertain and give effect to legislative intent. State v. Sliger, 846 S.W.2d 262, 263 (Tenn. 1993). The Legislature is presumed to know the existing state of the law when it enacts a statute. Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995). Moreover, the Legislature has said that statutes must "be construed according to the fair import of their terms, including reference to judicial decisions and common law interpretations." Tenn. Code Ann. § 39-11-104. Where, as here, the intent of the Legislature appears clear when reading the ordinary meaning of the statutory language, this Court should not limit or extend that language's import, regardless of how we might perceive the equities of the cause. Overman v. Overman, 570 S.W.2d 857, 859 (Tenn. 1978). By the Legislature not limiting the term "theft" in the felony murder statute, then we can only conclude that the Legislature intended it to embody all types of theft, including all types formerly defined as something other than larceny.

As noted above, the Appellant principally relies upon the case of State v. Gilliam, C.C.A. No. 03-C-01-9109-CR-00287, Hamilton County (Tenn. Crim. App., Knoxville, Apr. 20, 1992), perm. to appeal denied, (Tenn., Sept. 21, 1992). The instant case, however, can be distinguished from Gilliam. In Gilliam, the court focused on the fact that the underlying felony of theft was theft by taking and that the Appellant's purpose was to steal the car and that this goal had been accomplished. Id. at 3. In the instant case, the theft with which Appellant was charged and

convicted was based on his **exercise of control** over the stolen property without the owner's effective consent. The police chase was already in progress when the crime of theft (exercising control over the stolen property) occurred in Sullivan County, Tennessee. Because Appellant was driving the stolen vehicle at the time of the incident, he was certainly exercising control over the stolen property. See Tenn. Code Ann. § 39-14-103. The Appellant explained that "[t]he reason I didn't stop [during the pursuit by law enforcement officials] was because I was scared . . . all I wanted to do was get on the interstate and get out of the van and leave it there and get away from it." Obviously, from Appellant's statement, he was in the act of exercising control over the stolen property as he admitted that he wanted to get rid of property of which he was not the owner. Furthermore, the instant case can be distinguished from Gilliam in that the officers involved here knew that the vehicle was stolen, regardless of the fact that the initial attempt to pull the vehicle over was for a traffic violation.

We acknowledge that the killing must have been committed "in pursuance of the unlawful act, and not collateral to it." State v. Farmer, 296 S.W.2d 879, 883 (Tenn. 1956). However, we disagree with the Appellant's argument that his actions in the present case were collateral to the homicide and bore no intimate relationship to the underlying felony of theft. A homicide is committed during the perpetration of a felony if the homicide is committed within the *res gestae* of the felony. See Smith v. State, 354 S.W.2d 450, 452 (Tenn. 1961). Within the context of the felony murder rule, the *res gestae* requires that the felony and homicide be part of a continuous transaction, that the homicide be incident to the felony, or that there be no break in the chain of events between the felony and the homicide. See generally Erwin S. Barbre, Annotation, *What Constitutes Termination of Felony for*

15

*Purpose of Felony-Murder Rule*, 58 A.L.R.3d 851, 856, 865-874 (1974). The *res gestae* embraces not only the actual facts of the transaction and the circumstances surrounding it, but also the matters immediately antecedent to the transaction and having a direct causal connection with it, as well as acts immediately following it and so closely connected as to form in reality a part of the occurrence. Payne v. State, 406 P.2d 922, 925 (Nev. 1965). Thus, the *res gestae* of the crime begins at the point where an indictable attempt is reached, and ends where the chain of events between the initial crime and the homicide is broken. See Parker v. State, 570 So. 2d 1048, 1051 (Fla. Dist. Ct. App. 1 1990); State v. Rider, 625 P.2d 425, 430-431 (Kan. 1981); Payne, 406 P.2d at 924; Commonwealth v. Kelly, 10 A.2d 431, 433 (Pa. 1940).

The defendant's actions must be one continuous integrated attempt to successfully complete his crime and escape. Factors to be considered in determining whether there has been a break in the chain of circumstances include the relationship between the underlying felony and the homicide in point of time, place, and causal relationship. Farmer, 296 S.W.2d at 883. In State v. Terry, our supreme court discussed the following factors relating to the relationship between the underlying crime and the homicide: whether the victim was a witness to the theft-related crime; whether the victim was in close proximity to the crime; and whether the victim was killed because he might have tried to thwart the theft, expose the theft, or interfere in any way with the commission of the theft. 813 S.W.2d 420, 424 (Tenn. 1991). In the case of flight, an important consideration is whether the fleeing felon has reached a place of temporary safety. See People v. Ford, 416 P.2d 132, 141 (Cal. 1966), cert. denied, 385 U.S. 1018, 87 S. Ct. 737 (1967), overruled in part by, People v. Satchell, 489 P.2d 1361 (Cal. 1971); People v. Boss, 290 P. 881, 883

16

(Cal. 1930); Parker, 570 So. 2d at 1051 (citing LaFave, *Substantive Criminal Law* § 7.5 (1986)); Lampkin v. State, 808 P.2d 694, 696 (Okla. Crim. App. 1991). If these factors, considered in light of the circumstances of the particular incident, reveal a definite break in the chain of events, eliminating the possibility of one continuous transaction from the initial attempt of the underlying felony to the homicide, then the felony murder rule cannot be applied.

The police officer who was killed in the instant case was a witness to the theft (as that term is defined by the Legislature) and he was standing in the pathway of the stolen van as Appellant exercised control over that van by driving it right into the officer. The victim was attempting to apprehend Appellant during the commission of the theft. The theft played an integral role in the police officer's death. The theft was not collateral to the homicide.

The Appellant argues that it is conceivable that a strict and literal interpretation of the theft statute as it relates to felony murder could sometimes lead to "irrational outcomes not contemplated by either the legislature or the courts." However, Appellant's case is not one of those situations. Sufficient evidence exists to support the conviction for felony murder, and this issue is without merit.

III. Special Jury Instructions

Appellant submitted seven requests for jury instructions, four of which related to the jury's determination of whether the killing occurred during the perpetration of the theft. The issue before us only involves the four requests dealing with the perpetration of the theft. The trial court granted one of those requests in

17

part, as that part followed the Tennessee Pattern Instruction, but it wholly denied the other three.

The trial court's jury instruction on a killing committed in the perpetration of a theft provided that the killing must have been "closely connected to the alleged theft and was not a separate, distinct and independent event." Appellant submitted instructions which expanded on the explanation of the term "perpetration" (proposed jury instructions 1, 5, 6 and 7). See, e.g., Terry, 813 S.W.2d 420; Farmer, 296 S.W.2d 879; Gilliam, C.C.A. No. 03-C-01-9109-CR-00287.

In Tennessee, the trial court must charge the jury completely on the law applicable to the facts of the case. Poe v. State, 212 Tenn. 413, 370 S.W.2d 488, 491 (Tenn. 1963). Although special requests usually are entertained if fundamental to the case, the trial judge may deny a special request when the existing instructions fully cover the law on a subject. State v. Bryant, 654 S.W.2d 389, 390 (Tenn. 1983). Special jury instructions need not be given when the existing instructions are a correct statement of the law and adequately cover the subject matter contained in the special request. Id; see also State v. Taylor, 771 S.W.2d 387, 399 (Tenn. 1989).

The statute proscribing felony murder defines the crime as "[a] killing of another committed in the perpetration of or attempt to perpetrate" any of several enumerated offenses. Tenn. Code Ann. § 39-13-202(a). As the court's jury instructions elaborated, our law requires that the killing be "closely connected" to the felony and not be a "separate, distinct and independent event." Although Appellant's instructions might have further elaborated on the notion of "closely connected," we

18

nevertheless conclude that the instructions given by the trial court were a correct statement of the law and adequately covered the subject matter contained in Appellant's special requests. We therefore, hold that the trial court did not err in refusing to give Appellant's specially requested instructions. This issue is without merit.

## IV. Lesser Included Offenses

In its charge to the jury, the trial court instructed the jury on the offenses of felony murder, second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. Appellant contends that the trial court erred in charging the lesser offenses to the crime of felony murder.

Appellant has not demonstrated that he was prejudiced in any way by the trial court's instructions on these offenses. Furthermore, this Court does not see how any prejudice could exist since Appellant was convicted of the highest offense for which he was charged. As the State correctly points out, this is certainly not a case where the Appellant can argue that he could have been found guilty either of the greatest offense or nothing at all, and that a verdict of a lesser offense prejudiced him by permitting a conviction of an offense which lies between the two extremes. The jury rejected all of the lesser offenses and convicted him of the greatest offense charged. Therefore, Appellant was not prejudiced by the trial court charging the lesser included offenses to felony murder. Even if there was any error in the trial court charging the lesser included offenses, that error would be harmless. Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). This issue is without merit.

19

## V. Sentencing

Appellant argues that the trial court erred in allowing the jury to sentence him to life in prison. When the jury announced its verdict of guilty of first degree murder, the foreman responded to the trial court that the jury had fixed the sentence at life imprisonment. The trial judge then polled each juror, and each juror answered affirmatively that he or she had found Appellant guilty of first degree murder and had set the sentence at life imprisonment. After the jury was dismissed, the trial judge addressed Appellant and stated that based on the jury's verdict, the trial court found him guilty of first degree murder and sentenced him to life imprisonment.

Under Tennessee Code Annotated section 39-13-202(c), the minimum sentence available for a Appellant who is convicted of first degree murder is life imprisonment. Tennessee Code Annotated section 39-13-208(c) does provide that where no notice is given of the State's intent to seek the death penalty or life imprisonment without the possibility of parole, then upon conviction for first degree murder, the Appellant shall be sentenced to imprisonment for life by the trial court. The State in this case did not seek the death penalty or life imprisonment without the possibility of parole. Therefore, Appellant asserts that since the statute clearly states that the court must render such a sentencing decision, then it was error for the court to allow the jury to do so. However, the fact that the jury indicated that it set the sentence at life imprisonment is immaterial. Appellant received the minimum sentence under the law and can therefore show no prejudice from the fact that the jury stated that it imposed the minimum sentence prior to the trial court also imposing the minimum sentence.

20

Appellant further argues that the trial court erred in instructing the jury that a Appellant who receives a sentence of life imprisonment shall not be eligible for parole consideration until the Appellant has served at least 25 full calendar years of that sentence. However, upon review of the record, it appears that not only did defense counsel consent to the instruction, but actively insisted that the instruction should in fact be given to the jury. Specifically, defense counsel quoted from Tennessee Code Annotated section 39-13-204(e)(2) stating, "[t]he jury shall be instructed that a defendant who receives a sentence of imprisonment for life shall not be eligible for parole consideration until the defendant has served at least twenty-five (25) full calendar years of such sentence." He went on to say, "If that is not, if that's not, if the Jury's not instructed on that, we think that's a real problem." Again, it was defense counsel who brought this statute to the court's attention, and when the State and the court subsequently agreed that it should be given, the trial judge accordingly added this to the jury charge. A party may not, in effect, invite or condone action and then claim the action to be an error that requires relief to that party. See Tenn. R. App. P. 36(a). This issue is without merit.

Having found that Appellant cannot prevail on any of his issues, we affirm the judgment of the trial court.


_____
THOMAS T. WOODALL, Judge



CONCUR:

21

_____
DAVID G. HAYES, Judge


_____
 DAVID H. WELLES, Judge

22